### HUDSON COUNTY COURT OF COMMON PLEAS.

THOMAS JACKSON, PETITIONER-APPELLEE, v. MALLINCK-
RODT CHEMICAL WORKS, RESPONDENT-APPELLANT.

Decided September 20, 1946.

For the petitioner-appellee, *Louis E. Saunders (John A. Laird,* on the brief).

For the respondent-appellant, *Vickers & Castelli.*

ZIEGENER, C. P. J. This is an appeal from the determination, finding of fact and rule for judgment made by the Workmen's Compensation Bureau, on November 20th, 1945, awarding compensation to Thomas Jackson, the petitioner, against Mallinckrodt Chemical Works, the respondent, for both temporary and permanent compensation, by reason of the contraction of mercury poisoning, during the course of his employment.

It had been stipulated that the rate of compensation would be $20 per week, and the issue was whether the petitioner had suffered an occupational disease, and whether there was a causal relationship between his disability and his employment, as contended by him, or whether his condition was caused by the disease known as myasthenia gravis.

The petitioner testified at his home, before a Supreme Court examiner, due to the fact that he was bedridden. His age then was forty-five years, and he entered into his employment with the respondent on October 27th, 1927, as a utility man or laborer, at which time he was engaged in general chemical handling. His health had been good. He engaged in this work for about six years, or until the year 1934, when he commenced working with mercury proper, starting in the mill room where sieving of corrosive sublimate was done. In this work he was supplied with rubber gloves, a respirator and goggles. The corrosive sublimate came in corrugated drums weighing about 400 pounds each, from which it was removed with a rubber scoop, into the funnel of a shaker. It was then shaken into a keg in front and the residue entered the back of the shaker. In the course of this process some of the corrosive sublimate would spill on the petitioner. There would be a very heavy dust present, due to poor ventilation or suctions used to draw off the dust. The corrosive sublimate was a mixture of mercury and chlorine gas, known as bichloride of mercury, which at that time was in granulated form. He performed this process every day from Monday till Saturday, in building known as A 6. This dust got on his body, under the goggles, on to his eyelashes and into his eyes, and also into his nose and mouth, irritating these parts acutely, causing a very stinging bite in the nostrils and making him sneeze; causing his eyes to water and sting very badly; and making it necessary to wash his mouth. It also got into his clothes and on his hands and neck, so that he could peel the skin off. He left this operation about the year 1936, when he went in another part of the same building as an operator, making corrosive sublimate, at which he worked until he was disabled on February 8th, 1943. As an operator he would begin in the morning by preparing his glasses, goggles and gloves, and by cleaning out the exhausts of the receivers which were used to hold the corrosive sublimate of mercury bichloride which he made. He would clean out the exhaust and examine the receivers for cracks or leaks, and if there were none he would turn on the gas and then ascertain whether mercury was needed in the pans. In

the process the chlorine gas and mercury would burn and corrosive would form. It would be blown into the receiver, where it would crystallize into corrosive sublimate. It was necessary for him to clean out the pipes which would become clogged with corrosive and in doing so, he would come in contact with a mercurial compound, some of which got over him due to pressure inside the receiver, which caused the light corrosive to fly all around in dust form.

That after he started the six receivers which he operated he would go to the mercury vault and get ten or twelve flasks of mercury which he would pour in the course of his work. As he removed the stoppers from the flasks a sharp bitter odor emanated. During the course of the day he would pour about sixty pounds of mercury in each of the receivers. Sometimes it would spatter as he was pouring it and it would get into his clothes and around his face. He also said that in the making of mercury recovery, which is the residue salvaged from the floor, he was exposed to mercury dust or mercury fumes. In this process the sweepings were placed in a keg and sieved and that the residue was put in a shoal and water; acid and iron were added and the mixture was cooked, and the sediment remaining after the liquid was removed contained the mercury which was filtered from the heavy mudlike residue. He smelled these fumes all day long. The fumes escaped from leaking receivers and emanated from the various parts thereof. At times the leaks were very bad and large amounts of fumes would result. He would repair these leaks, and while so doing, would wear a regular gas mask instead of a respirator, in order to avoid choking. The bad leaks would occur about three times a month. Upon finishing work at night he had to wash his gloves, goggles and respirator to remove the corrosive sublimate or mercury bichloride. This was done in hot water which caused fumes to rise from the respirator, causing an odor to emanate which was similar to the one caused by the dust. In washing the hands a corrosive hand wash was used to remove the stings and bites, which he sometimes got from taking samples of the substance and at other times from washing.

On Wednesdays and Saturdays of each week the receivers

would be cleaned, which was done by lining a box with Bakelite, and pushing the box against the back of the receiver from which the lid had been taken off, and the corrosive was pulled out with a hoe, coming out in lumps, granules and in powder form. The corrosive was then weighed and placed in trays in a dryer. In this process the corrosive sublimate, as it dropped into the box, caused light dust to form and fly about, some of which came in contact with petitioner's goggles and neck. At other times the machine would clog up and it became necessary to clean out the exhausts. When the exhaust would clog fumes escaped. The apparatus was very bad and many leaks occurred in the beginning and until about three years before petitioner was disabled; but the apparatus had been greatly improved during the said final three years. Until these improvements were made a person could not walk into the plant without covering his mouth and nose.

Petitioner was in general good health when he went to work for the respondent, and he underwent periodical examinations thereafter, in the plant. He first noticed his illness in September, 1942, when his eyes were crossed. He continued to work until Christmas, 1942, when he experienced weakness in his legs, ankles, wrists, forearm, back, neck and fingers. Prior thereto he suffered from this condition slightly but about Christmas and New Year's he stayed home for two weeks because he felt very bad. He went to the doctor and then returned to work during the first week of January, 1943, and continued to work until February 8th, 1943, when he became disabled. He lost the use of his limbs and could not move. He was attended by a physician who administered injections of prostigmine bromide. His tongue swelled and his throat became affected and he had to be fed through the arm. He was required to use oxygen for breathing purposes; and unusual amounts of saliva collected in his throat and mouth and had to be swabbed out. He was unable to move his head into position and his nerves became badly affected. He could not hold anything without excessive trembling, and suffered from sleeplessness for a period of two months. He was admitted into Christ Hospital on April 30th, 1943, and remained there until July 10th, 1943. His eyes were badly

affected and he could move them only very slightly from side to side. When he left the hospital there was very little improvement in his condition. Thereafter he improved very gradually until he could use his limbs a little and could see, However he was unable to do work of any kind. He said that he had never suffered from any venereal disease, syphilis, gonorrhea or any other sickness.

He was sent to Dr. Shook, the respondent's doctor, who said he would not examine him that day as he would have to get in touch with the respondent first, but that he would let him know when he would have to come to the Medical Center. He did not go to the Medical Center as he was unable to do so, but he wrote the respondent a letter informing it of his inability to go to the said hospital, and requesting that a physician be sent to him, which request was refused.

On cross-examination petitioner testified that he was treated on February 8th, 1943, by Dr. Sinclair, and that he had also been treated by him previous to that date. He also said that he had received a communication from the respondent informing him that if he were going to Christ Hospital, or some other hospital, to be examined, it would pay the necessary expense but that it would not be responsible for Dr. Sinclair's treatment or charges. He also said that he had a talk with respondent's physician, Dr. Shook, who instructed him to continue on with Dr. Sinclair. Petitioner wrote the respondent that he was bedridden and unable to go to the Medical Center, but the respondent did not arrange to take him to the hospital, nor did it send any doctor to his home, until after he returned from the hospital.

Petitioner was corroborated by his wife, Mamie Jackson, as to the condition of his health, his illness and the treatment which he received. She said that in September, 1942, he started to get weak and his eyes began to fail, becoming very red, while the lids drooped; and that thereafter weakness of his muscles, arms, hands and legs set in; that it stayed that way for awhile, and then became worse, until the Christmas holiday season, when he had to stay home. He went back to work after New Year's and continued to February 8th, 1943, when he had to discontinue his work. He could hardly get

around the house by himself and she had to help him in and out of bed and to the bathroom. When he came home on February 8th, 1943, he was assisted by some of his fellow employees, who brought him home in a car. She observed that he expectorated a great deal and that there was an excessive flow of saliva from his mouth; that his tongue was thick and that he mumbled instead of talking. She sent for Dr. Sinclair, who treated him from then to the present time. He had to get glasses; his eyes got crossed and he could not look straight, and could move his eyes only to the sides. He was sent to the hospital on April 30th, 1943, and when he returned on July 10th, 1943, he was still helpless. She said that before he went to the hospital he wrote a letter to the plant about receiving medical care. She also wrote a letter for him for the same purpose. An answer was received from the respondent to the petitioner's letter, which is in evidence. She then testified about bills which she had received for hospital, medical and laboratory services, including a bill from Dr. Sinclair for $366.

On behalf of the respondent, Robert B. Moore testified that he was employed by it for nine years and that he held college degrees in chemical engineering; that he was employed in the corrosive sublimate process, also referred to as the bichloride of mercury process, of which he was the supervisor, and that he was a co-worker of the petitioner, who taught him the work; he described in detail the process. He said that from his personal experience he did not know whether Jackson was compelled to wear a gas mask, but that he was instructed to do so if it were necessary; also that in the ordinary process of manufacture Jackson was ordinarily not exposed to chlorine, except in the case of accidental breakage; that in regard to mercury he did not feel qualified to answer because he could not detect or smell mercury, as it could not be detected through the five senses, it being necessary to employ a special testing device to do so. When asked whether there might be any escape of mercury in a case of breaks in the system, he said it was a very difficult question to answer. He described the manner in which tests were conducted for that purpose. In describing chlorine he

said that it had a very sharp odor, very distressing and irritating to the nasal membranes. He said that to his knowledge chlorine could cause skin irritation but that mercury could not; and that salts of mercury, as distinguished from the metal mercury itself, could be very highly irritating to the skin, eyes and mouth, and wherever it could enter. That the corrosive sublimate is formed by the reaction between metal mercury and chlorine. He described the manner in which the atmosphere in the plant was controlled and changed to eliminate dust; and the efforts which were made to keep conditions good and workable in the room where the bichloride of mercury process is carried out. He said that this practice reduced the concentration of dust; that there were seven of the units of the type on which Jackson worked in the entire plant, but they were all confined to one room. He described the process of turning off the source of heat prior to cleaning out the exhaust tubes which became clogged or stopped up with bichloride of mercury. This was done by waiting a specified time after shutting the units down, permitting the gas to cool off, so that in cleaning there would be no leakage of the chlorine gas or corrosive sublimate dust into the room. The cleaning of the tubes was an every day occurrence. These tubes were so designed that by removal of rubber stoppers an operator could poke through them with a long Bakelite rod and push the corrosive sublimate clogging the tube either into the bottle or back into the receiver from which it came; and if there were any escape of mercury it would undoubtedly be accompanied by an escape of chlorine gas; and that it was inferred if there were chlorine leakage there was probably also mercury vapor leakage. He described the procedure of the plant in sealing the leaks through which the chlorine and mercury escaped, adding that they had had no such leaks in close to two years.

On cross-examination he said that thermal shock caused breakage or cracks through which chlorine vapor substantially escaped and that mercury vapor might also escape there; that ordinarily the crack is small, and that only chlorine gas can escape through it but that if it were a little larger some corrosive particles of mercury might escape. That

when the stoneware vessels cracked fumes from the corrosive sublimate escaped. In some cases the cracks can be repaired and it had been the custom in the past to repair the cracks, and they had found by experience that considerable time was lost in making repairs, and that it was therefore more economical to install new receivers instead of making repairs. That since they had adopted this practice the receivers have not been cracking. He was asked why, if the operator was not exposed to the vapor and fumes when the equipment was in a good state of repair, it was necessary to wear goggles, a mask and a respirator, and to take the other precautions such as ventilation, exhaust systems and other safeguards, he said that these protections were used to provide additional precautions against bichloride, mercury and chlorine gas. He also said that the men were instructed to wash parts of the equipment at the expiration of each day, and that in so doing they could get some of the corrosive sublimate on their hands, and that this could have happened to the petitioner. That it was necessary for the operator to make six trips from the receiver to the dryer closet, with boxes containing the crystalized mercury or bichloride of mercury, which varied considerably in size from a fine powder to a large lump about the size of a fist, or larger. When these crystals are drawn out of the receiver with a hoe some dust arises, in connection with which a local suction is placed there to reduce or control the dust, but that there is some dust present, consisting of the bichloride of mercury; and that in spite of the precaution it is possible for the dust to reach the hands and face of the operator. It normally took three to four hours during the course of the day for an operator to clean out six receivers. A glass plate is placed upon the mercury in the pans (over the whole pan) as a precaution, to minimize the volatilization of the mercury, which would otherwise vaporize more rapidly. He did not know whether the ventilation entirely eliminated the mercury vapors. He said that the salts of mercury was a very corrosive and destructive substance to the tissues. The respondent provided a corrosive wash for employees who worked with mercury; also shower facilities, with instructions for the taking of a shower every night, for which pur-

pose they were allowed a half an hour. He further said, that if the petitioner said that the salt of the mercury stung him around his mask on his face, and that sometimes his hands peeled because of the effect of the corrosive, it would be entirely possible and probable. In referring to the ventilation system he said that it could not completely remove all of the dust but that it did minimize it. He recalled the period of time that the petitioner was absent from his work during the Christmas holiday period in 1942, and said that when he reported back to work he was placed at the same work that he had done before.

Ernest Conte, called as a witness on behalf of the respondent, qualified as a chemical engineer, and said that since 1920 he had been chief chemist and safety director of the respondent company. That he knew the petitioner since about the year 1921, when he first came to the plant; and that the petitioner left sometime in 1924 and came back in 1927, since which time he had worked continuously for the respondent. He described the precautions taken to protect employees from injury caused by mercury. He said that powerful exhausts were used to remove the vapors and dust from the room, and further that precautions were taken to avoid injury caused by spilling mercury, saying that if one hundredth of a grain reached the eye it would cause such pain that you couldn't see for awhile. He said also that dust would form while handling mercury with a scoop, and that a respirator was worn to prevent the dust from entering the system; that the dust might stay on the body, because of which protective creams and lotions were furnished to the employees. That it was known to the respondent that bichloride of mercury is corrosive and will destroy the tissues if it comes in contact with the skin. That mercury is definitely odorless, but that it is volatile with low pressure. He referred to his records showing injuries which the petitioner had received, one of which occurred on July 22d, 1935, when he got corrosive sublimate in his right eye; which records included absence from his employment for nine months in 1931, because of muscular weakness, but those records did not disclose the cause of said ailment. He also said that when there is a bad

leak corrosive sublimate, formed by the combination of the chlorine and mercury, escaped. That the corrosive sublimate could be absorbed into the skin or through the skin into the body.

John Ruska, testifying for the respondent, said that he had been foreman since 1930 and that he worked with the petitioner; that the petitioner left the employment in 1924 and returned in 1927; that in 1930 petitioner suffered from weakness and was unable to handle a five pound scoop of chemicals, with one hand; and that petitioner told him that he went to different doctors who advised him that they were unable to determine the cause of his condition; and that up to that time the petitioner did not handle any mercury. Petitioner left Ruska's department in 1934, and went to work in building A 6, manufacturing corrosive sublimate, since which time he had nothing further to do with him.

William W. Fuchs, testifying for the respondent, said that he had been employed by it for twenty-four years, in different positions; that he was an analytical chemist in charge of the laboratory, and that he was assistant plant manager, in charge of manufacturing. That petitioner became sick in 1930, and showed signs of physical weakness and was unable to do his work properly. That prior to 1930 he did not handle mercury but sometime thereafter he was transferred to building A 6, the corrosive sublimate department, where he was given the protection afforded all mercury operators. He described the safety equipment used and the instructions which governed men working with mercury, such as the use of separate lockers for street clothes and working clothes, taking of showers and the use of separate tooth brushes and dentifrice, and creams for skin protection. On cross-examination he said that all mercury is volatile and odorless and that when a leak occurred the operator would smell the chlorine gas and would know that he was heading for trouble if he did not shut off the unit. He said that the precautions described by him were taken because mercury dust or bichloride dust is highly corrosive, and the slightest trace of it on the skin causes an irritation; and that they insist that every man in the manufacturing department be allowed time to take a shower be-

cause of the hazard in mercury. That in washing their gloves the workmen are exposed to the corrosive and that an antiseptic solution is used for that purpose. He said that he had never come in contact with bichloride or mercury fumes, but that he had come in contact with the dust, and that it caused the nose and throat to sting. He was shown *Exhibit P-1,* the letter written to the petitioner in answer to his letter seeking medical care, and his attention was called to the statement that Dr. Shook, respondent's doctor, desired him to retain his present physician, as he was not in a position to handle any more cases, and that he would try to have Dr. Shook get in touch with him. He acknowledged that the contents of the letter were correct.

The medical testimony was most voluminous and was given by Drs. Sinclair, Johnson, Alter and Meehan, for the petitioner, and Drs. Lewis, Ruoff, Kassel, Shook and Wolff, for the respondent.

Dr. Sinclair said that he examined petitioner on December 1st, 1942, and found him weak and extremely nervous, and suffering from sleeplessness and loss of appetite. That he was also suffering from muscular weakness, and had difficulty in walking to work, and his symptoms were becoming more aggravated. That he took a history of his employment and suspected that his condition was caused by mercury. That on February 8th, 1943, petitioner became bedridden and almost helpless, and had practically lost the use of his muscles. It caused him to be hospitalized. He said that he was 100% disabled and would never be able to work again. His diagnosis was chronic mercury poisoning manifested as severe muscular asthenia, generally known as myasthenia gravis, which he explained as weakness of the muscles to a severe degree. He was the treating physician. He said that it was reasonable to assume that the condition was caused by mercury, saying that it was quite frequent in such cases to have muscular weakness, extreme nervousness, ailments of the gums and tooth discolorations. He said that in his opinion, to a reasonable medical certainty, petitioner's exposure to mercury was the competent, producing cause of his condition.

On cross-examination he said that he found no evidence of

mercury in the system because no examination could be made for that purpose; that there was no mercury recovered from the urine or excretion. He said that the term myasthenia gravis was used by him to describe the generalized muscular weakness.

Dr. Johnson said that the major portion of his practice was confined to syphilis and dermatology; that he had examined the petitioner, at his home in December, 1943, and had come to the conclusion that he had chronic mercury poisoning, and gave the reasons for his conclusions. He said that he had examined the hospital records, which gave the impression that the petitioner may have had neurosyphilis, but that in his opinion, from the tests described in the records, from his examination, and from the history of the case, petitioner was not suffering from syphilis. He estimated petitioner's disability at 100% of total.

Dr. Alter said that he was a pathologist connected with various institutions, that he had worked on mercury poisoning cases, and qualified as an expert on the subject. He examined the petitioner on January 24th, 25th, and February 7th, 1944. He testified in detail about his examinations of the petitioner, his findings and the possibilities of the causes of petitioner's condition, and said that he could exclude, as the cause thereof, such diseases as tabies, or neurosyphilis, multiple sclerosis, myasthenia gravis and bulbar palsy. He said that in muscle weakness myasthenia gravis is first suspected, but the disease usually occurs in women between the ages of twenty and forty years, and that he never heard or read of a single case in middle aged or elderly males; and that he had never seen a myasthenia gravis affect lower extremeties with the exclusion of bulbar nerves, and added that the petitioner's bulbar nerves were not affected while his lower extremeties showed extreme weakness. His diagnosis of petitioner's condition was chronic mercurial poisoning, and he gave the technical reasons for his diagnosis, in detail. He said that the lesions which he found in his examination were entirely due to atrophy of the muscles, which confirmed his diagnosis and excluded myasthenia gravis, which he said, had no atrophy of the muscles. He was asked a hypothetical

question containing the history of the case, petitioner's symptoms, his condition and his employment, as set forth in the testimony, which question he answered by saying, that in his opinion, the cause of petitioner's condition was not the disease of myasthenia gravis. He explained in great detail the difference between that disease and mercurial poisoning. It was his opinion that petitioner's exposure to mercury was the competent, producing cause of his condition. He estimated petitioner's disability at 100% of total.

Dr. Meehan testified that he examined the petitioner at his home on July 19th, 1943, and found him in a weakened condition, unable to talk and walk, and confined to his bed. His speech was affected and he suffered tremors of his tongue, eyelids and fingers. He observed that the petitioner had lost the functions of his trunk; that his eyeballs were bulging, and that the left upper lid drooped; that he had inflammation of the gums and mouth, and his teeth were loosened. He concluded from his examination that petitioner was suffering from mercurial poisoning, with the residual effects thereof known as mercurial cachexia, and that he was totally and permanently disabled. He testified in detail as to the petitioner's condition, his symptoms and the reasons for his diagnosis, and the reasons for eliminating other possible causes of petitioner's condition, and said that in his opinion, the exposure of petitioner was causally related to the conditions which he found, and that the exposure was the competent producing cause of petitioner's condition.

Dr. Lewis testified that he examined petitioner, for the respondent, on December 3d, 1943, with Dr. Ruoff; that he took a complete history of petitioner, and that he made extensive laboratory surveys and tests; that he had had a great deal of experience in cases of this kind; and that he had testified in many mercury cases, but that he could not tell the court the cause of petitioner's condition; that there was nothing in his findings which would indicate that it was due to mercury poisoning. His diagnosis was myasthenia gravis, obesity, and latent syphilis "with a question mark." He described myasthenia gravis as a specific disorder occurring somewhat more commonly in females than males, but occur-

ring in both sexes from the second decade on, and added that the origin thereof was unknown. However, on cross-examination, he said that it would be perfectly possible for the petitioner to have a true mercurialism stomatitis, and that the neuromuscular disorder might be entirely independent.

Dr. Ruoff examined the petitioner on two occasions, October 11th and December 3d, 1943. He had the benefit of the laboratory findings and specimens taken by Dr. Lewis. He testified in detail as to the history of the case and petitioner's condition. His testimony was similar to that of Dr. Lewis. He said the case was definitely one of myasthenia gravis, with which cases he had a great deal of experience. He had had cases of acute or chronic mercury poisoning, but he found nothing to indicate that petitioner's condition was due to such poisoning. He added that the cause of the disease was not known. On cross-examination he eliminated syphilis as a cause of petitioner's condition.

Dr. Kassel, testifying for the respondent, said that he was an interne at Christ Hospital from April to July, 1943, and that at the time that petitioner was in said hospital he was not licensed in the State of New Jersey but was licensed in New York. He found no evidence of mercury poisoning, and his diagnosis was myasthenia gravis, which diagnosis was made the first night. Later in his testimony he said it was the first case of myasthenia gravis that he had observed and that he never treated or handled a mercury poisoning case. He said that this disease rarely occurs in males of petitioner's age; that he had never read or heard of a case of that kind affecting a man of that age; and that in mercury poisoning cases the greatest weight is given to the man's exposure to mercury. That although petitioner's entire body, including his lower extremeties were affected, the disease of myasthenia gravis rarely affects the lower extremeties. He was questioned about his diagnosis of syphilis or neurosyphilis and he admitted that he might have been mistaken about this diagnosis.

Dr. Shook, testifying for the respondent, said that he was the respondent's physician and had made periodic examinations of the petitioner up to the time he left the company, and

that the last examination was made in November, 1942. He found petitioner's teeth poor, his gums inflamed and a condition of gingivitis, which he said was also referred to in some instances as stomatitis. He was asked whether it was possible and probable that these conditions might have been caused by a mercurial deposit in the system and he said that it was possible, but that he wouldn't say it was probable. He also said that when he examined the petitioner in 1942 he found his eyes in normal condition, with no crossing and no drooping of the eyelids. In the course of his periodic examinations of the petitioner, during the said period of time, he made no record of any ailment of petitioner's muscles or nerves, saying that if he had found any such condition he would probably have made a note of it, because that was the purpose of his examinations to see whether the men were in good health and able to work. He was questioned about petitioner's visit to his office in December, 1942, when the respondent had sent him there for examination. He said that he told the petitioner that he would be sent to the hospital for examination, but petitioner never came back. His attention was called to the letter which Mr. Fuchs had sent to the petitioner informing him that the doctor (Dr. Shook) was not able to handle any more cases. He said that he did not recall discussing the matter with Mr. Fuchs. He added that he had a notation in his records of petitioner's examination, that he was well nourished, well developed and that his muscles were strong; and that he found nothing wrong with his tongue, throat or his speech.

Dr. Wolff, an optometrist, testifying for the respondent, said that he made an examination of the petitioner's eyes on February 24th, 1931, and that he has not seen him since; that at that time he was wearing glasses to correct an eye strain, and that he had a ptosis in the right upper lid which he described as a drooping of the lid over the pupil. He gave no treatment because the glasses were all that the petitioner needed.

In considering the medical testimony, I find that the question to be determined, is whether the petitioner's disability, conceded by all of the doctors, is due to disease, or whether

it is the result of mercurial poisoning contracted in the course of his employment with the respondent. The respondent contends that petitioner is suffering from myasthenia gravis, of which the origin is unknown. Although Dr. Sinclair has referred to his condition as being that of myasthenia gravis, he found and testified that mercury poisoning was the cause thereof, and that he used the term to describe the generalized muscular weakness. He did not refer to the condition as being one of disease.

Petitioner's other medical witnesses testified that his condition was not one of myasthenia gravis but that it was due to mercurial poisoning. I do not find Dr. Sinclair's testimony to be at a variance with the testimony of petitioner's other doctors. While the testimony given by the respondent's doctors sets forth that the petitioner's condition is due to myasthenia gravis, and not to his exposure to mercury, I have reached the conclusion that the medical testimony preponderates in favor of the petitioner's claim, and that his condition is due to chronic mercury poisoning, and that the competent producing cause of his condition was exposure to mercury during his said employment.

I find from the testimony and evidence in the case that the petitioner has established his claim by a credible preponderance of the evidence, and that therefore, the determination, finding of facts and judgment made by the Workmen's Compensation Bureau, on November 20th, 1945, should be affirmed.

I find and determine that Thomas Jackson, the petitioner, did contract, while in the employ of Mallinckrodt Chemical Works, the respondent, a compensable occupational disease of mercurial poisoning, due to exposure of mercury.

I find and determine that medical treatment which the petitioner required was requested by him of the respondent, but refused.

I find and determine that by reason of the contraction of mercurial poisoning by the petitioner during the course of his employment with the respondent, has been totally and permanently disabled.

I find and determine that the petitioner was temporarily

disabled from February 8th, 1943, to July 10th, 1943, or 21 5/7 weeks, for which he is entitled to compensation at the rate of $20 per week, being the sum of $434.28;

And that petitioner is entitled to compensation or his permanent disability for 400 weeks at the rate of $20 per week, or $8,000, making a total of $8,434.28, for both temporary and permanent disability.

Petitioner's right to further compensation beyond 400 weeks will be governed by section 34:15–12b of the Revised Statutes of New Jersey.

Petitioner is entitled to be reimbursed by the respondent, in the amount of $535.49, for monies expended for hospital care, ambulance, hospital bills and medicines.

Dr. Paul F. Sinclair is allowed $25 for appearance and testimony, to be paid by petitioner; and the sum of $366 to be paid him by the respondent for medical treatment given the petitioner.

Dr. Archie W. Johnson is allowed the sum of $50, to be paid by the respondent, for his examination of the petitioner and for his testimony.

Dr. George E. Meehan is allowed the sum of $50, to be paid by the respondent, for his examination of the petitioner and for his testimony.

Dr. Nicholas M. Alter is allowed the sum of $125 for his examinations of the petitioner, his appearances and testimony; of which sum the petitioner is to pay $75 and the respondent $50.

Petitioner's attorney, Louis E. Saunders, is to be reimbursed in the sum of $281.75, by the petitioner, for money expended in securing a transcript of the testimony for the trial.

Petitioner's attorney, Louis E. Saunders, is allowed a counsel fee of $1,000 for his services in the Workmen's Compensation Bureau, of which petitioner is to pay $350 and the respondent $650.

Stenographic costs to be paid by the respondent.

An order may be presented in accordance with the above.